THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | * | |
| TEKSYSTEMS, INC. | | |
| | * | |
| Plaintiff, | | |
| | * | Civil Action No.: RDB-08-3099 |
| v. | | |
| | * | |
| JONATHAN BOLTON, | | |
| | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff TEKsystems, Inc., has filed this lawsuit seeking an award of injunctive relief and damages against its former employee, Defendant Jonathan M. Bolton, for his alleged breach of restrictive covenants contained in the Employment Agreement.  This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Currently pending are the parties' cross motions for summary judgment.  The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2008).  For the reasons stated below, Plaintiff's Motion for Summary Judgment (Paper No. 21) is GRANTED and Defendant's Cross-Motion for Summary Judgment (Paper No. 27) is DENIED with respect to the issue of breach of contract.  Defendant Bolton is enjoined from violating the non-compete provision in the Employment Agreement for a period of eighteen months from the date of the Order that follows.  Finally, this Court's ruling with respect to Count II and the issue of damages is to await further briefing by the parties.

## BACKGROUND

Plaintiff TEKsystems ("TEK" or "the Company"), a Maryland corporation, is a leading technical staffing and services company.  Deposition of Kevin Phelps, taken May 14, 2009,

("Phelps Dep.") at 99.  In May of 1999, around the time that he received his undergraduate degree, Defendant Jonathan M. Bolton ("Bolton") accepted an offer to work with TEK as a Technical Recruiter in the New York City region.  Deposition of Jonathan M. Bolton, taken May 13, 2009, ("Bolton Dep.") at 11-15.  On June 7, 1999, Bolton entered into an Employment Agreement (the "Agreement") with TEK, which contains certain restrictive covenant provisions.  The Agreement provides, in pertinent part:

> 3.    <u>COVENANT NOT TO COMPETE:</u>  EMPLOYEE agrees that upon the termination of his/her employment, whether by TEKSYSTEMS or EMPLOYEE and whether with or without cause, for a period of eighteen (18) months thereafter EMPLOYEE shall not:
>
> (1) Engage in the business of recruiting or providing on a temporary or permanent basis technical service personnel (including, but not limited to, such personnel as engineers, designers, drafters, computer programmers, database administrators, systems analysts or other similarly skilled individuals engaged in similar lines of work), industrial personnel (including, but not limited to, assemblers, warehousemen, shipping/receiving, technicians, or other similarly skilled individuals engaged in similar lines of work), or office support personnel (including, but not limited to, secretaries, data entry personnel, mailroom personnel, administrative assistants, word processors, desktop publishers or other similarly skilled individuals engaged in similar lines of work) within a radius of fifty (50) miles of the office in which EMPLOYEE worked at the time his/her employment terminated . . .
>
> 5.    <u>COVENANT NOT TO DIVULGE CONFIDENTIAL INFORMATION:</u> EMPLOYEE covenants and agrees that, except as required by the proper performance of his/her duties for TEKSYSTEMS, he/she shall not use, disclose or divulge any Confidential Information or Trade Secrets concerning any TEKSYSTEMS clients, customers, employees, technical personnel, industrial personnel or office support personnel (as described in Paragraph 3) to any other person, entity or company besides TEKSYSTEMS . . .
>
> 6.    <u>RETURN OF RECORDS:</u>  EMPLOYEE agrees, upon termination of his/her employment with TEKSYSTEMS for any reason whatsoever, to return to TEKSYSTEMS all records (whether on paper, computer discs or in some other form), copies of records and papers pertaining to TEKSYSTEMS . . . .

Agreement ¶¶ 3, 5, 6.

During his nine-year tenure with TEK, Bolton was promoted on several occasions and he ultimately became the Director of Strategic Accounts, in which position he managed TEK's business with certain investment banking clients, including Bank of America (including the securities side of its business), Bear Stearns, JPMorgan Chase, Lehman Brothers, UBS, and Wachovia Securities.  Bolton Dep., at 37-38.  Bolton played a significant role in building TEK's IT-staffing business in the New York market and it is estimated that he oversaw 40 to 50 million dollars in business.  Phelps Dep. at 60.  Bolton was described by his primary supervisor, Kevin Phelps, as "the expert in [TEK's] organization and really the only expert that managed that segment of our business, specifically in the securities area . . . he literally was our brand in that area . . . ."  *Id.* at 60, 103.

While he was employed at TEK, Bolton attended periodic training sessions and he had access to the Company's confidential and proprietary information.  Bolton had loaded some of this information, in the form of client contact data, on his personal Blackberry.  Bolton Dep., at 174-76.  Upon his exit from TEK, Bolton returned his laptop computer and left with nothing but his keys, wallet, and his own personal Blackberry device.  *Id.* at 177-78; Phelps Dep. at 126-27.  Bolton notes that TEK never requested that he separate personal and business contacts on his Blackberry and he claims that he never used the information on his Blackberry in any way to conduct business for himself or his future employer.  Bolton Affidavit at ¶¶ 19, 20.

On April 21, 2008, Bolton accepted an offer of employment from another IT-staffing company named Steven Douglas Associates ("SDA").  Bolton resigned from TEK on April 23, and his last day with the Company was May 2, 2008.  Before his departure, Bolton provided TEK with a transition plan, which documented his knowledge about his accounts.  *See* April 27, 2008 Transition Plan (Pl.'s Ex. D.)  On his last day with TEK, Bolton was given a written

acknowledgement to confirm his understanding of the Agreement, but he never signed the acknowledgement form.  Bolton Dep. at 134-35.

Bolton began working with SDA on May 5, 2008, and he was given the title of "Managing Director of New York City."  *Id.* at 60, 267; Pl.'s Ex. E.  Approximately one week after joining, Bolton established an office address for SDA in New York City.  Bolton Dep. at 207.  However, Bolton explained that the new office merely served as a post office drop and did not contain any personal work space.  *Id.* at 204, 207, 267.  Since his hire with SDA, Bolton has worked from his home in Wayne, New Jersey, which is located within 50 miles of his prior office with TEK.  *Id.* at 186.

On June 16, 2008, TEK issued Bolton a cease and desist letter requesting that he provide written assurances that he would abide by the terms of his Agreement.  Pl.'s Ex. G.  However, Bolton never provided any response to the Company.  Bolton Dep. at 250, 252.  In September or October of 2008, Bolton established an office for SDA in Linwood, New Jersey, which is located more than 50 miles from his former TEK office at in New York City.  *Id.* at 184-85.  Although SDA advertised on its website that Bolton was the Company's contact person in the Linwood office, *see* Pl.'s Ex. H, Bolton stated that he never visited the office and that no SDA employees worked there.  *Id.* at 182, 200.

Within the first year of his employment with SDA, Bolton made nine placements for employment, seven of which were made with Credit Suisse in New York.  Bolton Affidavit, at ¶ 34; Pl.'s Ex. E at 15-16.  Bolton claims that he specifically targeted Credit Suisse for business because it had never been one of TEK's clients.  Bolton Affidavit at ¶ 13.  In addition, he claims that he obtained all nine placements by networking through Internet sites such as CareerBuilder and LinkedIn and that he "neither targeted nor [did] work with any of TEK's clients, nor with

any of the customers, applicants or personnel to be referred for TEK's clients or customers"

while he was employed with TEK.  *Id.* at ¶¶ 31, 32.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall

be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A

material fact is one that "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  In considering a motion for summary judgment, a judge's function is limited to

determining whether sufficient evidence exists on a claimed factual dispute to warrant

submission of the matter to a jury for resolution at trial.  *Id.* at 249.  "A party opposing a properly

supported motion for summary judgment 'may not rest upon the mere allegations or denials of

[his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for

trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)

(alteration in original) (quoting Fed. R. Civ. P. 56(e)).  In that context, a court is obligated to

consider the facts and all reasonable inferences in the light most favorable to the nonmoving

party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also*

*E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  However, Rule 56

mandates summary judgment against a party "who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment—even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted).  The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985).  "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by filing its own motion.").  However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983) (citation omitted).

## ANALYSIS

### I.  Choice of Law

In a diversity action, a court applies the choice of law rules of the state in which it sits to determine the applicable substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Under Maryland law, the doctrine of *lex loci contractus* applies to contractual claims, meaning that the law of the place where the contract is made applies.  *Allstate Insurance Co. v. Hart*, 327 Md. 526, 529, 611 A.2d 100 (1992).  The Employment Agreement at issue in this case was executed

in Maryland and the contract specifically provides that Maryland law shall govern the merits of any dispute arising under the contract.  Agreement at ¶ 9.

## II.  Breach of Contract Claim

### A.  Covenant Not To Compete

In this case, it is undisputed that since he left TEK and began working for SDA, Bolton has worked out of his home in Wayne, New Jersey, a location that is within 50 miles of his former office with TEK.  Bolton has accordingly conceded that he violated the non-compete clause in Section 3(1) of the Agreement.  *See* Def.'s Cross-Motion at 14.  Bolton nevertheless defends against the breach of contract claim by arguing that the restrictive covenant in Section 3(1) is unenforceable as overbroad and because it fails to protect a legitimate business interest, imposes an undue hardship on Bolton, and contravenes the public's interest.

Under Maryland law, covenants not to compete may be enforced "only against those employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers."  *Becker v. Bailey*, 268 Md. 93, 97, 299 A.2d 835 (1973).  In determining whether a restrictive covenant in an employment contract is enforceable, courts assess "whether the particular restraint is reasonable on the specific facts."  *Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118, 123, 225 A.2d 288 (1967).  Such covenants will be enforced "if the restraint is confined within limits which are no wider as to area and duration than are reasonable for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public."  *Id.* (internal quotes omitted); *see also Deutsche Post Global Mail, Ltd. v. Conrad*, 292 F. Supp. 2d 748, 754 n.3 (D. Md. 2003) ("under Maryland law restraints in restrictive covenants must be viewed in the context of the hardship imposed on the employees and the necessity of the restraint to protect the employer's

interests"). When the scope of a restrictive covenant is considered to be reasonable on its face,

courts may, in determining enforceability, assess other facts and circumstances, such as:

> whether the person sought to be enjoined is an unskilled worker whose services
> are not unique; whether the covenant is necessary to prevent the solicitation of
> customers or the use of trade secrets, assigned routes, or private customer lists;
> whether there is any exploitation of personal contacts between the employee and
> customer; and, whether enforcement of the clause would impose an undue
> hardship on the employee or disregard the interests of the public.

*Budget Rent A Car of Wash., Inc. v. Raab*, 268 Md. 478, 482, 302 A.2d 11 (1973).

## 1. Scope

The non-compete restriction in the Agreement prohibits Bolton, for a period of 18

months, from working within a 50-mile radius of his former TEK office in New York City.

Defendant first challenges the scope of this covenant, claiming that it is overbroad in terms of its

temporal and geographical coverage.

With respect to the covenant's geographic scope, the covenant is reasonably

circumscribed. This Court has previously concluded that the 50-mile prohibition at issue is

facially reasonable under Maryland law. *See TEKsystems, Inc. v. Derek Spotswood*, Case No.

RDB 05-1532, Memorandum Opinion at 10, fn. 3 (D. Md. June 28, 2005). Moreover, covenants

imposing a far broader, or even unlimited, geographic limitation have been upheld by courts.

*See, e.g., National Instrument, LLC v. Braithwaite*, 2006 Md. Cir. Ct. LEXIS 12, at *17-18 (Md.

Cir. Ct. 2006) (upholding covenant restricting employee from competing in North America);

*Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998) (upholding covenant despite the

absence of any geographic limitation). It is significant that TEK operates on a nationwide and

international level, and that the covenant not to compete only forbids Bolton from competing

against the Company in the New York region. Bolton is not barred from working or even

competing against TEK in any market outside of the immediate New York City area.

The covenant is not overbroad in terms of its 18-month duration.  Courts applying Maryland law have repeatedly upheld competition and solicitation restrictions that cover two years.  *See PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002); *Gill v. Computer Equipment Corp.*, 266 Md. 170, 181, 292 A.2d 54 (1972); *Tuttle v. Riggs-Warfield-Roloson*, 251 Md. 45, 49, 246 A.2d 588 (1968); *National Instrument*, 2006 Md. Cir. Ct. LEXIS 12, at *19.  A two-year restriction has been upheld as "more than reasonable for it acknowledges that after a certain period of time the information with which [the employee] could depart, will become stale and significantly less disadvantageous to [the employer]."  *National Instrument*, 2006 Md. Cir. Ct. LEXIS 12, at *19.  Therefore, the 18-month restriction here was clearly compliant with the norms governing the temporal scope of restrictive covenants.

Bolton acknowledges that restrictive covenants of similar duration and area have been deemed reasonable by courts in the past.  He nevertheless claims that the covenant not to compete in Section 3(1) of the Agreement is overbroad in terms of the activity it prohibits.  He claims that a "restrictive covenant that prohibits any employee from engaging 'in *any* activity which *may* affect adversely the interests of the Company'" is overbroad.  Def.'s Cross-Motion at 25-26 (emphasis in original).  However, Bolton's argument is unpersuasive in light of the fact that courts in Maryland have sanctioned restrictive covenants that prohibit former employees from securing employment with competitors.  *See, e.g.*, *Intelus*, 7 F. Supp. 2d at 642 (enforcing covenant with no geographical limitation that restricted employee from working for one of the company's direct competitors); *PADCO Advisors, Inc.*, 179 F. Supp. 2d at 608 (enforcing covenant not to compete that prohibited former employee from working for employer's competitors).  Bolton adds that a restrictive covenant "must be *specifically targeted* at preventing the employee from trading on the good will he or she created while serving an employer's

customers." Def.'s Cross-Motion at 26 (emphasis in original). However, this Court declines to adopt such an inflexible mandate; in this case the geographic and temporal limitations contained in the Agreement's covenant not to compete properly constrain its scope to legally enforceable bounds.

## 2.  Other Factors Governing Enforceability

Having approved the scope of the covenant not to compete, this Court considers the other factors relating to enforceability, namely, the need to protect TEK's business interests, the nature of Bolton's qualifications and skills, the amount of hardship imposed on Bolton, and the public interest.

### i)  <u>Protection of TEK's Business Interests</u>

Employers have a legitimate interest in protecting their clients and good will by "preventing an employee from using his contacts with clients to recruit those clients after his employment has ended." *Intelus*, 7 F. Supp. 2d at 639 (citing *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 335, 572 A.2d 510 (Md. 1990)). This protective interest is especially strong "for businesses in which the personal contacts between the employee and the customer are an important element determining the business's success." *Intelus*, 7 F. Supp. 2d at 639 (citing *Millward v. Gerstung Int'l Sport Educ., Inc.*, 268 Md. 483, 488-89, 302 A.2d 14 (Md. 1973)); *see also Holloway*, 319 Md. at 335 (noting that covenants not to compete are warranted "if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee").

The covenant not to compete in the Agreement serves to protect TEK's legitimate business interests. A company's success in the IT-staffing industry depends overwhelmingly upon the ability of its employees to make and maintain personal connections with clients. In

addition, during his rise at TEK, Bolton was privy to the Company's client contacts and confidential information. Therefore, Section 3(1) is necessary to prevent TEK's former employees from abusing their access to inside information and from unfairly competing against the Company.

      ii)  <u>Bolton's Unique and Specialized Skills</u>

Courts are more willing to enforce restrictive covenants when the employee at issue possesses unique or specialized skills. Under Maryland law, a "unique or specialized skill held by an employee, by virtue of knowledge, ability, or reputation, is one that would make it difficult to find a substitute employee." *Ecology Servs., Inc. v. Clym Envt'l Servs., LLC*, 181 Md. App. 1, 19, 952 A.2d 999 (2008) (citing *Rosenstein v. Zentz*, 118 Md. 564, 570-71, 85 A. 675 (1912)).

The record reflects that Bolton was one of TEK's most important and successful operatives in the New York City region. After starting as a recruiter he was quickly promoted to the positions of Account Manager and Account Director, with responsibilities for direct client interaction. Ultimately Bolton assumed a senior management position within the company as Director of Strategic Accounts. By the time of his departure from TEK, Bolton had established himself as the point person on several of TEK's investment banking accounts, which were a source of significant revenues for the Company. Bolton was described as the "subject matter expert" in TEK's Information Technology field and as the "most knowledgeable of the customers, their buying patterns, their idiosyncrasies . . . and ultimately, the candidate pool associated with that." Phelps Dep. at 136. In sum, it is clear that Bolton was one of TEK's rising stars and that he was instrumental in expanding the Company's New York business.

      iii)  <u>Hardship to Bolton</u>

When assessing the validity of a restrictive covenant, courts also consider the amount of harm facing the employee as a factor weighing against enforcement. Such covenants are normally upheld unless they are found to "impose undue hardship on the employee." *Becker*, 268 Md. at 96. Bolton submits that "New York, as a financial hub, provides an unmatched base of potential clientele" and that it would not be possible for him, "based upon his experience, knowledge and abilities to make a financially adequate living if he were precluded from working within the New York area." Def.'s Cross-Motion at 34.

Bolton's arguments as to undue hardship are unpersuasive. As an initial matter, his claims are speculative because he never attempted to seek new employment opportunities outside of the New York City region. Moreover, while the covenant could create some inconveniences for Bolton, this Court does not find that such inconveniences rise to the level of undue hardship. *See PADCO Advisors*, 179 F. Supp. 2d at 608 (rejecting employee's claim that relocation of family and unemployment for sixth months resulted in undue hardship).

iv) Public Interest

Finally, concerning the issue of public interest, it has been recognized that the public benefits from the enforcement of reasonable restrictive covenants. *See Ruhl*, 245 Md. at 123-24. Such measures facilitate and protect business growth, especially in technology-related and information-based fields. *See Intelus*, 7 F. Supp. 2d at 642. Therefore, "[a]s long as employers do not restrict employees from earning a living and do not limit fair competition, they must be given the opportunity to provide a service to their customers without risking a substantial loss of business and good will every time an employee decides to switch employment." *Id.*

3. Conclusion

Bolton breached the non-compete clause set forth in Section 3(1) of the Agreement by engaging in the IT-staffing business in the New York City region after his employment with TEK ended.  This provision is enforceable under Maryland law, as its geographic and temporal limitations were reasonably circumscribed, and traditional fact-specific considerations weigh in favor of enforcement.  Consequently, summary judgment is hereby entered in favor of TEK on its breach of contract claim.[1]

### III.   Remedies

As a remedy for breach of contract, the Agreement allows, under certain circumstances, for the imposition of monetary and injunctive relief in Subsections 7(a) and (b), respectively.  In Count II, TEK seeks an equitable accounting.

### A.  Damages

The Agreement contains a liquidated damages provision in Subsection 7(b), which provides that "as a consequence of a violation of the covenants contained herein, EMPLOYEE shall pay to TEKSYSTEMS an amount equal to one hundred percent (100%) of the gross profit, or twenty-five percent (25%) of the gross sales, whatever amount is greater, resulting from business generated by EMPLOYEE . . . through soliciting or otherwise competing for accounts or personnel in violation of Paragraph 3 and Paragraph 5 herein."  TEK contends that pursuant to this provision, it is entitled to receive an award of $200,000—a figure representing the gross profits that SDA derived as a result of the nine placements that Bolton obtained in the New York market in the year after his departure from TEK.  Pl.'s Motion at 22.

---

[1] TEK also alleges that Bolton breached Section 5 of the Agreement, which contains a covenant not to divulge confidential information, and Section 6 of the Agreement, which requires Bolton to return to the Company all records relating to TEK.  However, this Court need not reach these allegations, as it has already determined that Bolton breached the Agreement by failing to comply with the non-compete provision in Section 3(1) of the Agreement.

To receive actual damages as a consequence of Bolton's breach, TEK must show that Bolton "solicit[ed] or otherwise compet[ed] for accounts or personnel" in violation of Paragraph 3, which prohibits former employees from soliciting or competing for any persons or entities which "at any time within two (2) years prior to the date of termination of EMPLOYEE'S employment, was a client or customer of [TEK]." Agreement at ¶ 3(2). These provisions provide that the liquidated damages clause is only triggered if TEK can show that Bolton generated money by competing with its clients. If triggered, the amount of damages owed to TEK would equal the amount of profits or gross sales derived through Bolton's competitive actions.

TEK's first argument in support of its claim for damages clearly fails. TEK contends that Bolton's placements with Credit Suisse were impermissible because TEK had previously sought Credit Suisse's business. However, to prove that it suffered actual damages, TEK must show that Credit Suisse was an actual client and not merely a potential client. Instead, the record reflects that Credit Suisse could never have been TEK's client since it lacked preferred vendor status. Bolton Affidavit at ¶¶ 12, 13.

In addition, TEK has failed to substantiate its second argument in support of its claim for damages. During the discovery process, TEK designated Kevin Phelps as its corporate representative to testify on its behalf at a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). At his deposition on May 14, 2009, Phelps testified that he was not aware of any TEK clients that were solicited by Bolton after he left the company. *See* Phelps Dep. at 137, 151-52. However, in its Reply brief, filed on August 18, 2009, TEK claims that it had "recently analyzed its client database and learned that Bolton has in fact communicated with TEK client Dresdner Kleinwort ("Dresdner"), after his employment with TEK ended and made a placement for

Dresdner on behalf of SDA."  Pl.'s Reply at 7.  In support of this statement, TEK submitted a declaration from Mike Greenstreet, the Director of Business Operations for TEK's New York City office, and a copy of a TEK business record showing that Bolton had made a placement with Dresdner in 2005.  Pl.'s Exs. 1 and A.  Greenstreet avers that at the time of Phelps' deposition, TEK had conducted a limited search of TEK's clients and had failed to discover the Company's connection with Dresdner.  Greenstreet Decl. at ¶¶ 6-8.  Greenstreet contended that the "Dresdner placement was not reasonably ascertainable."  *Id.* at ¶ 8.

The Greenstreet declaration and TEK's business record may not be properly considered for purposes of ruling on the parties' motions for summary judgment.  Under Fourth Circuit law "as a general proposition, a party may not submit an affidavit or declaration at the summary judgment stage contradicting its earlier deposition testimony."  *Caraustar Indus., Inc. v. N. Ga. Converting, Inc.*, No. 04-187, 2006 U.S. Dist. LEXIS 91829, at *19 (W.D.N.C. Dec. 19, 2006) (citing *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990)).  This rule has been repeatedly applied to bar evidence contradicting the prior Rule 30(b)(6) deposition testimony of a corporate designee.  *See, e.g.*, *Rainey v. American Forest and Paper Association, Inc.*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998) ("[u]nless it can prove that the information was not known or was inaccessible, a corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition); *United States v. J.M. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C. 1996) (holding that if a party states that it has no knowledge as to a set of alleged facts at a Rule 30(b)(6) deposition, it is barred from arguing for a contrary position at trial).  To justify TEK's eleventh hour attempt to introduce evidence of the company's connection with Dresdner, Greenstreet baldly claims that his evidence "was not reasonably ascertainable."

However, this justification is unavailing—a more thorough search could easily have been conducted in preparation for Phelp's 30(b)(6) deposition.

At the current juncture, TEK's claim for substantial damages appears to be somewhat speculative.[2]  However, because the record is not sufficiently developed on the issue, this Court is not yet prepared to rule on damages.  Within thirty days of the Order that follows, the parties should notify the Court whether it is felt necessary to litigate the question of damages.[3]

## B.  Injunction

In addition to damages, TEK seeks a permanent injunction to compel Bolton to comply with the Agreement's non-compete provision.  Subsection 7(a) of the Agreement provides that "in the event of the violation of any covenant contained herein . . . TEKSYSTEMS . . . shall be entitled to an injunction or other equitable relief in any court of competent jurisdiction . . . ."

This Court has issued injunctions in cases involving similar circumstances to enforce covenants not to compete.  *See, e.g.*, *Intelus*, 7 F. Supp. 2d at 643 (granting motion for preliminary injunction to enforce restrictive covenants in employment agreement).  In considering the propriety of injunctive relief under Maryland law, courts are mindful that:

> The standard for an injunction in Maryland is "relief 'prohibiting someone from doing some specified act' or commanding someone to undo some wrong or injury . . . generally, it is a preventive and protective remedy, *aimed at future acts*, and it is not intended to redress past wrongs." *Colandrea v. Wilde Lake Community Assoc.*, 361 Md. 371, 761 A.2d 899, 911 (Md. 2000) (citing *Carroll County Ethics Comm'n v. Lennon*, 119 Md. App. 49, 703 A.2d 1338, 1342-43 (1998)) (emphasis in original).  A permanent injunction may be ordered if there

---

[2]  Even if TEK is not entitled to substantial damages on its breach of contract claim, it would still be entitled to nominal damages.  Under Maryland law, "[i]t is well settled that every injury to the rights of another imports damage, and if no other damage is established, the party injured is at least entitled to a verdict for nominal damages."  *Cottman v. Maryland, Dep't of Natural Res.*, 51 Md. App. 380, 443 A.2d 638 (1982) (internal quotation marks and citations omitted); *see also Stueber v. Arrowhead Farm Estates Ltd. Partnership*, 69 Md. App. 775, 779, 519 A.2d 816 (1987) ("whenever there is a contract and breach of that contract the trial court must assess some damages, nominal or substantial as it shall find to be proper on the law and the evidence") (emphasis in original) (internal quotations omitted).

[3]  In the event that the parties do not believe that there is any necessity for litigating the question of damages, then this Court will merely enter a nominal damages figure.

"has been a determination on the merits of the claim." *Maryland Com'n on Human Relations v. Downey Communications, Inc.*, 110 Md. App. 493, 678 A.2d 55, 67 (Md. 1996).

*PADCO Advisors*, 179 F. Supp. 2d at 612.

This Court concludes that entry of a permanent injunction is warranted in this case as a remedy for Bolton's breach of contract.  Although it does not appear that TEK is entitled to any substantial damages under the Agreement, it is deserving of prospective relief to prevent any future injury that could otherwise result from Bolton's continued operations in the New York City region.  This Court has previously observed that "if the non-compete period is not enforced through equitable extension, it could 'reward the breach of contract, encourage protracted litigation, and provide an incentive to dilatory tactics.'" *PADCO Advisors*, 179 F. Supp. 2d at 613 (quoting *Roanoke Engineering Sales Co. v. Rosenbaum*, 223 Va. 548, 555, 290 S.E.2d 882 (1982)).  Several courts facing similar circumstances have ordered an extension of the restricted period as a means of equitable relief.  *See, e.g.*, *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371-72 (8th Cir. 1991) (extending restrictive covenant term based largely upon defendant's breach of a covenant not to compete); *Premier Indus. Corp. v. Tex. Indus. Fastener Co.*, 450 F.2d 444, 448 (5th Cir. 1971) (affirming grant of injunction that extended restricted period beyond the termination date of the original covenant); *PADCO Advisors v. Omdahl*, 185 F. Supp. 2d 575, 578 (D. Md. 2002) (issuing an equitable extension of a non-compete covenant beyond the covenant's original expiration date).

Since the Agreement's covenant not to compete expired on December 5, 2009, the question arises as to what extent injunctive relief should be extended into the future.  In *PADCO Advisors*, this Court determined that an employer should be given credit for the entire period of

non-competition that was originally set in the contract.  In that case, the covenant's period was extended for a period of time equal to the duration of the employee's incompliance.

In this case TEK is entitled to receive credit for the entire 18 month prohibition against competition that is contained in the Agreement.  Bolton began working with SDA only three days after leaving TEK, and he established SDA's office address in New York City within the same month in May of 2008.  Therefore, the record reflects that almost immediately after leaving TEK, Bolton had worked as a recruiter for SDA within 50 miles of New York City, and that he has continued to do so until the present time.  Therefore, Bolton will be prospectively enjoined from engaging in activity prohibited by the covenant not to compete for a period of 18 months going forward.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Paper No. 21) is GRANTED and Defendant's Cross-Motion for Summary Judgment (Paper No. 27) is DENIED on the breach of contract claim.  A permanent injunction shall be entered enforcing the non-compete provision of the Agreement for a period of 18 months starting from the date of this Memorandum Opinion and accompanying Order.  This Court's ruling with respect to the issue of damages will await notification by the parties within the next thirty days and possible subsequent briefing.  A separate Order follows.


Date : February 4, 2010                              /s/_____
                                                     Richard D. Bennett
                                                     United States District Judge

18